FILED IN OPEN COURT
U.S.D.C. - Atlanta

FEB 1 7 2026

KEVIN P. WEIMER, Clerk
By            Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| *v.* | Criminal Information |
| JULIE EDWARDS | No. 1:26-cr-060-TRJ |

THE UNITED STATES ATTORNEY CHARGES THAT:

**Count One**
**Money Laundering**
**[18 U.S.C. § 1957]**

At all times relevant to this Information:

1. Drive Planning LLC ("Drive Planning") was a Georgia limited liability company formed in 2015. Drive Planning billed itself as a comprehensive financial group that offered investors the ability "to create an investment portfolio which offers greater control over your return, taxation, and potentially guarantees." Drive Planning claimed that its investment portfolio consisted of traditional stocks and bonds but went well beyond "Wall Street with offerings such as energy projects, real estate, storage units, film and television, CBD Oil, and other business opportunities."

2. Defendant **JULIE EDWARDS** was Drive Planning's Chief Administrative Officer. **EDWARDS** was responsible for, among other things, maintaining Drive Planning's "Master Spreadsheet" on which Drive Planning tracked investments, withdrawals, and other information. Although **EDWARDS** interacted with

Drive Planning's investors, she was not responsible for soliciting investors, drafting promotional materials, and preparing collateral sheets.

3. David Burkhalter was the founder, owner, and Chief Executive Officer of Drive Planning. Burkhalter formerly held a Series 65 securities license.

4. David Bradford was Drive Planning's Chief Operating Officer.

5. Individual-1 was a managing partner of Drive Planning and headed its Indiana branch office. Individual-1 joined Drive Planning in or about July 2022 and resigned from the company in or about August 2024. From approximately 1996 to 2021, Individual-1 worked as a registered representative for several Securities and Exchange Commission ("SEC") registered broker-dealers. Individual-1 also held Series 6 and 63 FINRA licenses.

6. Drive Planning offered multiple investment opportunities, including: (i) the "Real Estate Acceleration Loan" opportunity or "REAL," and (ii) the "Cash Out Real Estate Fund" or "CORE Fund."

7. Drive Planning marketed investing in REAL and the CORE Fund as "easy and simple," advising prospective investors that they did not have to be an "accredited investor," and that they could invest in REAL and the CORE Fund by using money from retirement accounts, savings, and lines of credit.

8. Drive Planning maintained multiple bank accounts at Truist Bank in which it received investor funds, including for REAL ("Truist x2951") and the CORE Fund ("Truist x3621"), and an operating account at JPMorgan Chase Bank ("JPMC x5917"). Burkhalter had signatory authority over each of these accounts and sole control over Truist x3621. Burkhalter's wife had signatory authority

2

over Truist x2951 and JPMC x5917. **EDWARDS** had signatory authority over Truist x2951.

### The REAL Investment Program

9. REAL was Drive Planning's primary investment vehicle. In promotional materials, on its website, and through Burkhalter and others, Drive Planning marketed REAL to prospective investors as a "bridge loan opportunity promising 10% in 3 months." Drive Planning explained that "bridge loans" were short-term loans made to real estate developers to both complete existing projects and to fund new ones. Drive Planning was allegedly lending its investors' money to developers to provide them with "immediate cash flow for all current and future projects." Drive Planning claimed that the developers (*i.e.,* borrowers for the bridge loans) had "offered a piece of real estate (owned outright) as a collateral for all loans made and provide[d] a copy of the Quitclaim deed" to Drive Planning. Drive Planning emphasized in its promotional materials that REAL investments were "fully collateralized (guaranteed) by real estate."

10. Drive Planning further described REAL as "100% passive income from real estate developments." Drive Planning also claimed that it was "paid back with high interest rates . . . [making] sure [each] loan [to developers] is secured by cash and real estate collateral."

11. Real Estate Developer-1 was a Georgia limited liability company engaged in the development and sale of real estate. Real Estate Developer-1 has been involved in real estate, land development, construction, and community banking

3

for over 70 years in metro Atlanta. M.E. owned and operated Real Estate Developer-1.

12. No later than fall 2020, Burkhalter approached M.E. about Drive Planning raising funds (*i.e.*, providing "bridge loans") for Real Estate Developer-1. Initially, an individual "invested" with Real Estate Developer-1 by loaning Real Estate Developer-1 the funds directly. Real Estate Developer-1 and M.E. paid Drive Planning and Burkhalter a percentage of the "investment" for introducing the individual to Real Estate Developer-1. The loan agreement was between Real Estate Developer-1 and the individual (rather than Drive Planning), and Real Estate Developer-1 did not offer any collateral to secure this investment.

13. Subsequently, any loans to Real Estate Developer-1 involving Drive Planning came directly from Drive Planning rather than an individual investor. Burkhalter and Drive Planning entered into loan agreements with Real Estate Developer-1 and M.E. under which Real Estate Developer-1 would pay Drive Planning 15% interest on the loaned funds. M.E. told Burkhalter and Bradford that Real Estate Developer-1 was willing to put up real estate as collateral for the loans if Real Estate Developer-1 needed to refinance the loans at a lower interest rate. Real Estate Developer-1 never put up any real estate as collateral in connection with any loans or "investments" it received from Drive Planning. Drive Planning's investors were also not entitled to a percentage of the profits from Real Estate Developer-1's projects.

14. M.E. worked with Burkhalter and Bradford to develop a brochure about Real Estate Developer-1 that Drive Planning could use to solicit investments.

4

M.E. provided information about Real Estate Developer-1's projects, timelines, and profits. Burkhalter and others at Drive Planning routinely provided this brochure to prospective investors.

15. Because of Real Estate Developer-1's status as a well-known multi-generational real estate developer in Atlanta, Georgia, Drive Planning specifically highlighted its relationship with Real Estate Developer-1 when soliciting individuals to invest in REAL. Indeed, Drive Planning's agents and promotional materials for REAL did not mention or specifically identify any other real estate and property developers with whom Drive Planning had a relationship.

16. At Burkhalter's direction, Drive Planning prepared "collateral sheets" for investors that purportedly identified properties and their purported fair market values against which investors' funds were secured.

### The CORE Fund

17. Drive Planning marketed the CORE Fund to prospective investors as providing "100% Passive Income from Tax Liens." Drive Planning guaranteed investors a return of 10% every six months or a 22% return per year for up to three years. Drive Planning further claimed that investors' funds in the CORE Fund were pooled together, government protected, and fully collateralized.

18. In promotional materials, Drive Planning alleged that Company-1 was its "investment partner" for the CORE Fund. Drive Planning described Company-1 as a "privately run real estate investment company that focuses on Tax Liens and Foreclosures."

19. D.P. and J.P. owned and operated Company-1, which invested in real estate, with a specific focus on "tax deeds." Company-1 offered a subscription-based investment fund to investors.

20. Tax deed investing allows investors to gain ownership over a property that has been foreclosed on because of unpaid property taxes. Investors can acquire a tax deed at a public auction after foreclosure, which permits the relevant government entity to recoup some or all the unpaid property taxes. The winner of a tax deed auction is granted a deed to the property and, after any redemption period elapses, may dispose of the property as they choose, for example, selling the property "as is," "flipping and selling" the property, or using it as a rental property.

21. In or about June 2021, Company-1 established Real Estate Fund-1 as an investment vehicle through which it pooled subscriber funds to invest in tax deeds. Company-1 earned a management fee tied to the amount of funds that Real Estate Fund-1 deployed. Company-1 also prepared a private placement memorandum ("PPM") for Real Estate Fund-1 that was made available to potential subscribers in which it disclosed that the investment involved a "high degree of risk" and offered no guaranteed rate of return. In fact, the PPM explicitly stated that Real Estate Fund-1 offered "no guarantee that any investment selected by our Managing Member will generate operating income or gains." Company-1 disclosed the PPM to Burkhalter and Bradford.

6

*Drive Planning Operates as Ponzi Scheme*

22. Beginning no later than in or about September 2020 and continuing until in or about June 2024, Burkhalter, aided and abetted by others, executed a scheme to defraud investors who believed their investments in REAL and the CORE Fund were being used for their stated purposes. In actuality, Burkhalter operated a massive Ponzi scheme in which investor funds were being used to finance a luxury lifestyle, pay off other Drive Planning investors, and make commission payments to Drive Planning's agents.

23. Burkhalter and others at Drive Planning encouraged investors to use money from retirement accounts, savings accounts, and lines of credit to invest in REAL and the CORE Fund. Through its network of sales agents, Drive Planning solicited individuals nationwide to invest in REAL and the CORE Fund.

24. An individual who invested in Drive Planning executed a promissory note — signed by Burkhalter — and would then typically send their investment by wiring funds to Drive Planning's Truist bank accounts for REAL (Truist x2951) and the CORE Fund (Truist x3621). These wires came from investors throughout the United States.

25. To perpetuate the fraud, Drive Planning and Burkhalter also encouraged individuals to "rollover" their investments without disclosing that any withdrawal would be sourced from other investors' funds rather than returns from any legitimate investment.

26. Drive Planning promoted REAL and the CORE Fund online through its website, written promotional materials, and through sales agents (so-called "financial consultants"). The sales agents received a 4% commission on each REAL investment they sold, including on amounts that investors chose to "rollover" into new 90-day investments. Burkhalter and others at Drive Planning held frequent training for the sales agents but never disclosed that Drive Planning did not have a legitimate means to generate the necessary profits to meet its obligations to Drive Planning's investors and the sales agents. Burkhalter and others further incentivized the sales agents by creating the "President's Club" and "Chairman's Council," which were clubs where admission was based on achieving sales totaling $2.5 and $4.5 million, respectively. Membership to these clubs entitled a sales agent to an all-expense paid trip for two to various destinations, including Toronto, Cabo San Lucas, and the Greek Islands.

27. With the knowledge of Burkhalter and others at Drive Planning, **EDWARDS** maintained a master spreadsheet for Drive Planning for tracking investments, withdrawals, and other information. As Drive Planning grew, other administrative personnel were granted access to and updated the master spreadsheet.

28. Burkhalter operated Drive Planning as a Ponzi scheme from the inception of REAL. On or about September 22, 2020, Drive Planning received $50,000 from M.P., which was its first investment in REAL. These funds, which were deposited in Drive Planning's Truist x2951 account, were not loaned or invested with Real

8

Estate Developer-1 and not otherwise used to finance bridge loans or to enter joint ventures with any other real estate developers. Rather, at least $21,000 of M.P.'s investment was used to repay an earlier Drive Planning investor whose investment called for principal and fixed returns to be paid in October 2020.

29. Burkhalter also used investor money for his own personal benefit from the inception of REAL. On or about October 14, 2020, the second investor in REAL wired $30,000 to Drive Planning's Truist x2951 account. That same day, the third REAL investor wired $150,000 to the Truist x2951 account. At the time, Drive Planning's Truist x2951 account had a balance of approximately $11,689. Between on or about October 14 and November 16, 2020, Burkhalter used at least $80,000 in investor money to pay for RV-related expenses and his ex-wife's attorneys, rather than to make bridge loans or investments in any real estate developers.

*Misrepresentations with respect to REAL.*

30. Drive Planning and Burkhalter fraudulently induced individuals to invest in REAL by materially mispresenting: (i) that investors in REAL were guaranteed a 10% return on their investment every three months; (ii) that their investments were fully collateralized; (iii) the nature of Drive Planning's relationship with Real Estate Developer-1; (iv) the purported existence of business and investment relationships with other real estate developers; and (v) the source of Drive Planning's purported investment returns.

31. Drive Planning and Burkhalter falsely represented that investors' monies were being used in the manner for which it was solicited. In particular, a

9

significant number of investor agreements falsely represented that individuals' investments were being used with Real Estate Developer-1.

32. Burkhalter and others at Drive Planning falsely represented to investors that Drive Planning would pool their funds, loan the funds to real estate property developers, and enter into joint ventures with such entities, thereby generating the profit necessary to meet obligations to REAL investors. Indeed, the interest from any loans that Drive Planning made to any real estate developers (Drive Planning's so-called "investments") was insufficient, as Burkhalter knew, to meet Drive Planning's obligations to REAL investors. Burkhalter also knew that Drive Planning did not have any legitimate means of generating sufficient profits to meet its obligations to investors and sales agents. Burkhalter and others at Drive Planning failed to disclose to investors that Drive Planning did not receive substantial income from loans to or joint ventures with real estate property developers, including Real Estate Developer-1.

33. Between in or about September 2020 and in or about June 2023, the exact dates unknown, Drive Planning's investors were told and Drive Planning's promissory notes expressly stated that the investment was secured by real property "located in [Drive-Planning-Real Estate Developer-1] Portfolio of Properties." Subsequently, the promissory notes stated that an individual's investment was "secured by real property located in Drive Planning portfolio of properties." Burkhalter knew these representations about the investments being collateralized by real property were false.

10

34. On a date unknown, but no later than March 2023, M.E. learned that Drive Planning had raised a significant amount of money from investors in large part by highlighting Drive Planning's relationship with Real Estate Developer-1 and Drive Planning's alleged loans ("investments") or partnership with Real Estate Developer-1. M.E. was concerned about such claims for, among other reasons, (i) Drive Planning had loaned Real Estate Developer-1 a relatively small amount of money (totaling less than $2.1 million as of January 2023); and (ii) the possibility of Real Estate Developer-1 being exposed to legal liability based on Drive Planning's false and fraudulent claims about its relationship with Real Estate Developer-1 and the nature of loans and investments with Real Estate Developer-1.

35. On or about June 1, 2023, M.E., through counsel, notified Burkhalter that Drive Planning must "immediately cease and desist" from using Real-Estate Developer-1's "name in any manner whatsoever and confirm the same via written communication."

36. On or about June 16, 2023, Burkhalter sent an email to M.E.'s counsel falsely claiming that Drive Planning was no longer using Real Estate Developer-1's name in any of Drive Planning's material.

37. On or about July 31, 2023, M.E., through counsel, sent another letter to Burkhalter and Drive Planning stating that Drive Planning had "failed to provide a single piece of responsive information" as to M.E.'s request that Drive Planning "provide an accounting of all fundraising activity conducted by [Drive Planning] directly — or indirectly — utilizing [Real Estate Developer-1's] name." Burkhalter

11

was further informed that M.E. believed that Drive Planning "continue[d] to improperly misrepresent an affiliation" with Real Estate Developer-1 and M.E. The letter requested that Burkhalter and Drive Planning respond within 10 days of receipt acknowledging that Real Estate Developer-1 and M.E. were seeking at least $5 million for monies owed to Real Estate Developer-1. On or about August 3, 2023, **EDWARDS** emailed Burkhalter an electronic copy of the letter, noting that Drive Planning had received it by FedEx the day before.

38. On or about August 18, 2023, Real Estate Developer-1 filed suit against Drive Planning and Burkhalter in Superior Court of Fulton County Georgia seeking emergency relief because Drive Planning and Burkhalter had failed to acknowledge the earlier requests. Burkhalter later informed **EDWARDS** that Real Estate Developer-1 lost to Drive Planning in court and owed Drive Planning $10 million in damages.

39. Drive Planning and Burkhalter failed to disclose to investors that their funds were not loaned to or otherwise invested with Real Estate Developer-1 as they had been told. Nor did Drive Planning and Burkhalter disclose to investors that they had been sued by Real Estate Developer-1 and M.E.

40. Drive Planning and Burkhalter falsely represented to investors that their investments in REAL were fully collateralized. To conceal the truth from investors, Drive Planning prepared fraudulent "collateral sheets" identifying properties (some of which did not even exist) with fictitious valuations that purportedly served as collateral for their investors. Burkhalter knew that the

12

collateral sheets were entirely fraudulent because he participated in preparing the list of properties and valuations.

*Misrepresentations with respect to the CORE Fund.*

41. Burkhalter and Bradford interfaced with Company-1 through D.P. and J.P. D.P. and J.P. explained to Burkhalter and Bradford the nature of Company-1's business and Real Estate Fund-1, including that it invested in tax deeds, not tax liens. Although Bradford was Drive Planning's primary point of contact for Company-1, he did not control the flow of funds from Drive Planning to Real Estate Fund-1.

42. Burkhalter and others at Drive Planning solicited investments that were purportedly being invested in the CORE Fund. Bradford created a marketing brochure to promote the CORE Fund, and he provided the brochure to Drive Planning's sales agents to solicit investments from investors.

43. Burkhalter and others at Drive Planning materially misrepresented that Company-1 was Drive Planning's "investment partner" for the CORE Fund.

44. Burkhalter and others at Drive Planning fraudulently induced individuals to invest in the CORE Fund by materially mispresenting that: (i) investors in the CORE Fund were guaranteed a 22% return on investment; (ii) their investments were fully collateralized; and (iii) their investments were government protected. Company-1 was unaware of the CORE Fund and that Drive Planning had made these materially false representations regarding Real Estate Fund-1.

45. Burkhalter and others at Drive Planning concealed from investors that Drive Planning did not invest any funds in the CORE Fund, *i.e.*, with Company-

13

1, after on or about December 9, 2022. To the contrary, Drive Planning falsely represented to investors that Drive Planning was continuing to do so by, among other things, soliciting and receiving additional investments that were intended for the CORE Fund. Drive Planning received millions of dollars after December 2022 from individuals who believed that they were investing in the CORE Fund.

46. Company-1 regularly emailed Burkhalter and Bradford about Drive Planning's investment in Real Estate Fund-1, including on or about April 16, 2024. In the email, Company-1 noted that Drive Planning had not invested any money in 2023 with Company-1. In addition, on or about June 8, 2024, Company-1 sent a text message to Bradford telling him Company-1 had not received any funds from Drive Planning since 2022.

47. Despite receiving quarterly updates from D.P. and J.P. about the performance of Real Estate Fund-1, Burkhalter and Bradford failed to disclose to Drive Planning's investors who invested in the CORE Fund (or believed that they did) that the CORE Fund did not provide the returns Drive Planning promised.

**Drive Planning continued soliciting investments and paying commissions for months after learning of the SEC's investigation.**

48. No later than in or about March 2024, Burkhalter, Bradford, Individual-1, and **EDWARDS** became aware that the SEC was investigating Drive Planning. By way of example:

 a. On or about March 14, 2024, a Drive Planning sales agent sent Bradford a text message that another sales agent had cautioned

14

people to stop investing in REAL because the SEC was investigating Drive Planning.

b. On or about March 22, 2024, Individual-1 forwarded an email from an investor to Burkhalter and **EDWARDS** in which the investor stated that they had received an email from the SEC asking about Drive Planning and REAL. Later that day, **EDWARDS** wrote Individual-1, "[O]h gosh! What does this mean," to which Individual-1 responded: "I hope that Todd [Burkhalter] understands that this we are in the radar. And that's not a good thing."

49. On or about April 11, 2024, the SEC served a subpoena on Drive Planning. Despite being aware that the SEC had opened an investigation into Drive Planning, Burkhalter, Bradford, Individual-1, and **EDWARDS**, failed to disclose to investors and prospective investors about the SEC's investigation. Rather, Drive Planning—as **EDWARDS** was fully aware—continued to solicit investments through Burkhalter, Bradford, Individual-1, and others and pay commissions to Drive Planning's sales agents until in or about June 2024.

50. On or about May 1, 2024, Individual-1 and **EDWARDS** exchanged text messages about meeting with the SEC in which **EDWARDS** was asked if **EDWARDS** had heard from Burkhalter, and Individual-1 stated: "Just wanted to hear how things went. I think [Burkhalter] speaking with the SEC today?"

51. On or about May 21, 2024, Individual-1 sent a text message to Burkhalter, Bradford, **EDWARDS**, and others advising them that he had "[o]fficially been notified by the SEC . . . via email."

15

52. On or about May 21, 2024, at approximately 4:36 p.m. EST, Individual-1 sent a text message to **EDWARDS** stating, "Counsel just called me. He told me to stop drive offerings." At approximately 4:45 p.m. EST on that same day, Individual-1 called **EDWARDS** and they spoke for approximately five minutes. At approximately 6:43 p.m. EST on that same day, Individual-1 sent a text message to **EDWARDS** stating, "Hey, [**EDWARDS**], I'm not going to lie. I do not have a good feeling about this at all."

53. On or about June 5, 2024, at approximately 6:47 p.m. EST, Bradford sent a text message to Individual-1 stating, "Things just got worse. It looks very likely that drive planning fund will be turned over for receivership." On that same day, at approximately 10:34 p.m. EST, Individual-1 responded to Bradford via text message, "Yep. Not good."

54. On or about June 5, 2024, at approximately 10:37 p.m. EST, **EDWARDS**, at the direction of others, sent an email on behalf of the "Leadership Team" to Drive Planning's sales agents, copying Burkhalter, Bradford, and Individual-1, stating: "As promised in today's call, below is language you may use when having conversations with your clients." The approved language falsely claimed that Drive Planning was choosing "to pause all incoming funds into REAL . . . [to] allow our current obligations to come to fruition" out of Drive Planning's "commitment to [its] clients and responsible stewarding of REAL." The email from **EDWARDS** also informed the agents that "your individual REAL links will be shut down on June 16, 2024" and asked that they "remove all references to REAL within your social media, email signature blocks, and personal websites."

16

Burkhalter, Bradford, Individual-1, and **EDWARDS** knowingly failed to disclose to sales agents and the investors that the SEC was investigating Drive Planning.

55. On or about June 6, 2024, at approximately 4:15 p.m. EST, Burkhalter and **EDWARDS** spoke by telephone for approximately five minutes. At approximately 4:26 p.m. EST on that same day, Burkhalter wired **EDWARDS** $630,000 in fraudulently obtained investor funds from Drive Planning's Truist x2951 account to **EDWARDS's** Wells Fargo account.

56. On or about June 10, 2024, **EDWARDS**, at the direction of others, sent an email "[o]n behalf of the leadership team" to Drive Planning's sales agents, copying Burkhalter, Bradford, and Individual-1, stating: "After much consideration, we have decided to stop accepting new applications and loans for both the REAL and CORE programs as we continue to go through our internal audit. After last week's announcement, we received an unprecedented amount of new applications and funds and have found it necessary to take this action. . . . As we continue internal assessment of these programs, we plan to provide additional information in the coming weeks." Burkhalter, Bradford, Individual-1, and **EDWARDS** again failed to disclose to sales agents and investors that the SEC was investigating Drive Planning.

57. On or about June 11, 2024, **EDWARDS** spoke with B.R., who invested in Drive Planning and had convinced others to invest in Drive Planning. B.R. explained to **EDWARDS** that he had tried unsuccessfully to get in touch with Burkhalter, Bradford, or Individual-1. B.R. was attempting to reach one of them because B.R. learned that Real Estate Developer-1 had sued Drive Planning and

Burkhalter. **EDWARDS** falsely told B.R. that Drive Planning had prevailed in the lawsuit with Real Estate Developer-1 based on what Burkhalter had told her. **EDWARDS** also falsely informed B.R. that his REAL investments were "solvent" and laughed off the idea that Drive Planning was a scam. **EDWARDS** failed to disclose to B.R. that the SEC was investigating Drive Planning. If **EDWARDS** had informed B.R of the investigation, B.R. would have requested that Drive Planning refund his investments.

58. Between on or about June 12 and June 14, 2024, Individual-1 advised multiple investors to "cash out" their REAL investments, including telling one investor that "there are things going on at [Drive Planning] that I am not comfortable with."

59. On or about June 14, 2024, Individual-1 executed forms for several entities Individual-1 controlled, seeking to withdraw more than $750,000 from REAL.

60. Between in or about April 2024 and June 2024, Drive Planning received at least $67,000,000 in additional investments and paid over $15,000,000 in commissions. Indeed, even after Drive Planning informed investors that Drive Planning was going to pause the REAL Fund, between on or about June 5 and June 10, 2024, investors sent over $10 million to Drive Planning.

61. Between approximately May 1 and May 31, 2024, Bradford received over $2.6 million in commissions from Drive Planning. On or about May 31, 2024, for example, Bradford received a $896,428.72 commission payment from Drive Planning.

18

62. Between approximately May 1 and June 14, 2024, Individual-1 received over $1.2 million in commissions from Drive Planning. For example, on or about June 14, 2024, Individual-1 received a commission payment from Drive Planning of $341,193.

63. On or about June 18, 2024, **EDWARDS** met with the SEC to discuss Drive Planning.

64. On or about July 3, 2024, **EDWARDS** wired $638,280.59 to Tytan Title for the purchase of a residence in Cumming, Georgia, of which $630,000 was fraudulently obtained investor funds.

65. On or about July 10, 2024, **EDWARDS** executed a declaration that was submitted to the SEC in which **EDWARDS** stated under penalty of perjury that, among other things:

    a.  **EDWARDS** was Drive Planning's Chief Administrative Officer, responsible for "creating and maintaining a spreadsheet to track the status of promissory notes and investments" in REAL, as well as "overseeing . . . administrative employees, answering questions, aiding in payroll, making distribution to REAL lenders, and paying commissions to [Drive Planning's] financial consultants and brokers."

    b.  As of May 7, 2024, Drive Planning had insufficient revenue and assets to cover "the approximately $300 million in outstanding obligations to REAL investors."

c.  Burkhalter "has not disclosed to investors or sales agents that [Drive Planning's] revenue and real estate are insufficient to meet [Drive Planning's] obligations to REAL investors and sales agents."

66. Even after providing the declaration to the SEC, **EDWARDS** continued to communicate with Drive Planning's investors and, at Burkhalter's direction, use investors' funds to pay Drive Planning's expenses. In doing so, **EDWARDS** failed to disclose to investors the information **EDWARDS** provided in her July 10, 2024 declaration to the SEC. On or about August 13, 2024, for example, **EDWARDS** emailed investor M.E and advised M.E. that Individual-1 would be his new "Drive Planning financial consultant." That same day, **EDWARDS** also wired $200,000 from Drive Planning's bank account to a professional baseball team to cover Drive Planning's advertising expenses.

67. On or about August 13, 2024, the SEC filed a complaint in the United States District Court for the Northern District of Georgia alleging that Burkhalter operated Drive Planning as a massive Ponzi scheme since at least 2020.

68. On or about September 26, 2024, **EDWARDS**, despite the SEC complaint, closed on the Cumming, Georgia property using $630,000 in fraudulently obtained investor funds.

69. As part of the means to execute the scheme to defraud Drive Planning's investors, Burkhalter transmitted and caused the transmission of interstate wire communications. For example, on or about November 28, 2022, in the Northern District of Georgia, Burkhalter, for the purpose of executing and attempting to execute the above-described scheme and artifice to defraud, emailed D.E., the

owner of a Maryland-based financial services company, falsely characterizing Drive Planning's relationship with Real Estate Developer-1 and falsely stating that there existed "wholly owned real estate which serves as a collateral."

70. During the scheme, Burkhalter and Drive Planning defrauded more than 2,000 investors out of approximately $380 million.

71. On or about July 3, 2024, in the Northern District of Georgia, the defendant, **JULIE EDWARDS**, did knowingly engage and attempt to engage in a monetary transaction, by, through, and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, that is a transfer of $638,280.59 via wire from **EDWARDS's** Wells Fargo account to Tytan Title's Truist bank account for the purchase of a residence in Cumming, Georgia, $630,000 of which having been derived from a specified unlawful activity, that is, the wire fraud scheme alleged above, in violation of Title 18, United States Code, Section 1343.

All in violation of Title 18, United States Code, Section 1957.

### Forfeiture

72. Upon conviction of the sole offense alleged in this Criminal Information, the defendant, **JULIE EDWARDS**, shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(1), any property, real or personal, which constitutes or is derived from proceeds traceable to such offense, including, but not limited to, the following:

21

MONEY JUDGMENT: A sum of money in United States currency, representing the amount of proceeds obtained as a result of the sole offense alleged in this Criminal Information.

73. If, as a result of any act or omission of the Defendant, any property subject to forfeiture:

    a.  cannot be located upon the exercise of due diligence;

    b.  has been transferred or sold to, or deposited with, a third party;

    c.  has been placed beyond the jurisdiction of the Court;

    d.  has been substantially diminished in value; or

    e.  has been commingled with other property which cannot be divided without difficulty;

the United States of America intends, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of said defendant up to the value of the forfeitable property.

THEODORE S. HERTZBERG
*United States Attorney*

ALEX K. SISTLA
*Assistant United States Attorney*
Georgia Bar No. 845602

600 U.S. Courthouse
75 Ted Turner Drive SW
Atlanta, GA 30303
404-581-6000; Fax: 404-581-6181